******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

RUSSELL PEELER *v.* COMMISSIONER
OF CORRECTION
(AC 37382)

Alvord, Prescott and Mihalakos, Js.

*Argued November 15, 2016—officially released February 14, 2017*

(Appeal from Superior Court, judicial district of
Tolland, Sferrazza, J.)

*Lisa J. Steele*, assigned counsel, for the appellant
(petitioner).

*Harry Weller*, senior assistant state's attorney, with
whom, on the brief, were *John C. Smriga*, state's attorney, *Craig P. Nowak*, senior assistant state's attorney,
and *Richard K. Greenalch*, deputy assistant state's
attorney, for the appellee (respondent).

*Opinion*

ALVORD, J. The petitioner, Russell Peeler, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus.[1] On appeal, the petitioner claims that the habeas court erroneously (1) deprived him of his right to self-representation; (2) concluded that his claim that his expeditious criminal trial schedule violated his constitutional rights had been procedurally defaulted; (3) concluded that appellate counsel provided effective assistance; and (4) concluded that the state did not suppress evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).[2] We disagree and, accordingly, affirm the judgment of the habeas court.

The following factual and procedural history, as set forth in *State* v. *Peeler*, 271 Conn. 338, 348–55, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 103 L. Ed. 2d 110 (2005) (*Peeler II*), is relevant to the present appeal. "In the late 1990s, the [petitioner] and his brother, Adrian Peeler (Adrian), operated a large-scale drug trafficking network that sold crack cocaine (crack) throughout the city of Bridgeport. In 1997, the [petitioner] partnered with Rudolph Snead, Jr., to produce and distribute the crack. Snead's responsibilities included providing the [petitioner] with powdered cocaine, which the [petitioner], with the help of several associates, processed into crack and then sold on the streets. The partnership began to sour when, in 1997, the [petitioner] accused Snead of overcharging him for the powdered cocaine. Snead responded to the accusation by 'shooting up' a building on Benham Street in Bridgeport that the [petitioner] used as a 'crack house.' According to one of the [petitioner's] associates, the [petitioner] vowed to retaliate.

"In September, 1997, the [petitioner], Corey King, Shawn Kennedy, and the [petitioner's] cousin, Ryan Peeler (Ryan), were driving in Bridgeport when the [petitioner] noticed Snead's car parked in the lot of a barber shop. The [petitioner] observed Snead leave the barber shop, get into his car and drive away. At the time, the [petitioner] was aware that two young boys, later identified as Leroy Brown, Jr., and Tyrell Snead (Tyrell), were passengers in Snead's car.

"The [petitioner's] car followed Snead's car to the Lindley Avenue entrance ramp to Route 25. As Snead proceeded up the ramp, he slowed down and pulled off to the side. The [petitioner's] vehicle pulled up next to Snead's car, and the [petitioner], who was seated in the right front passenger seat, fired several shots at Snead from a .40 caliber, semi-automatic handgun.[3] The [petitioner] kept shooting until his gun jammed.

"Several of the shots fired by the [petitioner] hit Snead, injuring him, but not so severely that he was unable to drive away. A Bridgeport police officer, who

noticed glass falling from Snead's car as he drove by, stopped the vehicle. After Snead explained what had happened, the officer sent him to St. Vincent's Medical Center for treatment.

"At the hospital, another officer from the Bridgeport police department interviewed Snead and his two young passengers, Brown and Tyrell. The officer's investigative report included the names of all three interviewees. On the basis of Snead's identification of the [petitioner] as the person who had shot him, the [petitioner] was arrested and charged with attempted murder.

"The [petitioner], however, posted bond and was released from custody. After his release, the [petitioner] made it clear to his associates that he was furious with Snead for reporting the Lindley Avenue shooting to the police, and that he was going to 'get' him for giving a statement to the police. Subsequently, in May, 1998, while free on bond, the [petitioner] shot and killed Snead in the same barber shop that Snead had patronized immediately prior to the Lindley Avenue shooting.

"While investigating Snead's death, the Bridgeport police department performed ballistics tests comparing the shell casings retrieved from the murder scene with those from the Lindley Avenue shooting. The tests revealed that all of the bullets had been discharged from the same gun. The police were also aware that Brown could identify the [petitioner] as the shooter in the Lindley Avenue shooting, thus linking him directly to Snead's murder. On the basis of this information, the [petitioner] was arrested and charged with Snead's murder.

"The [petitioner], however, again secured his release by posting bond. As a condition of his release, the [petitioner] was required to observe a curfew and wear an electronic ankle bracelet to ensure compliance. Despite these precautions, the [petitioner] continued operating his drug trafficking business, albeit from a new location.

"In January, 1998, during the course of pretrial discovery in connection with the Lindley Avenue shooting, the state provided defense counsel with the police report identifying Brown and Tyrell as the two passengers in Snead's car when that shooting had occurred. The trial court, however, ordered counsel to conceal the names of the two children from the [petitioner] to ensure their safety.

"During the fall of 1998, the [petitioner] frequently discussed his pending cases with his attorney, and often speculated as to the identity of the state's witnesses. He noticed that his attorney had made an extraordinary effort to prevent him from learning the name or names of the state's witnesses. The [petitioner], however, remembered that during the Lindley Avenue shooting Snead had been accompanied by two children, Tyrell and Brown. He therefore surmised that those children

could be the state's witnesses in the cases pending against him.

"The [petitioner's] suspicions were confirmed when, one day while driving past 207 Earl Avenue in Bridgeport, where Brown lived with his mother, Karen Clarke, the [petitioner] saw Brown playing outside. When Brown saw the [petitioner], he looked surprised and immediately ran away. As a result, the [petitioner] concluded that Brown was in fact one of the state's witnesses. The [petitioner] thereafter openly contemplated the possibility of having someone kill Brown and Clarke.

"In December, 1998, the [petitioner] told his girlfriend, Angelina Keene, that she should move away from Bridgeport because he was going to start killing the witnesses against him.[4] At about the same time, the [petitioner] offered Kybarris Taylor $10,000 to kill two people. Specifically, the [petitioner] told Taylor that he wanted to eliminate 'two nobodies.' Taylor refused the offer. The [petitioner] also asked his brother Adrian and Josephine Lee, a crack addict and prostitute who lived across the street from Clarke and Brown, to carry out the killings. They too initially refused. Ultimately, however, Adrian agreed to commit the double homicide.

"The [petitioner] also told his associates that he wanted the witnesses killed with a revolver because, unlike a .40 caliber semi-automatic handgun, the shell casings would not be discharged from the revolver, making it more difficult to link the shootings to the gun.[5] In October, 1998, one of the [petitioner's] associates in the drug trade, Albrent Daniels, procured for the [petitioner] the revolver that was to be used to kill Clarke and Brown. . . . [King, another associate of the petitioner,] testified that at one point after the [petitioner] had gained possession of the gun, the [petitioner] described to several of his associates, including Adrian, what he intended to do with it. He said that he would put the gun to Brown's head and go '[p]ow,' simulating the sound of a gunshot. The gun eventually was given to the [petitioner's] brother, Adrian.

"At this same time, the [petitioner] and his drug trafficking associates moved their crack production to a house located at 200 Earl Avenue in Bridgeport, across the street from the house in which Clarke and Brown then lived. The residents of the 200 Earl Avenue address, including Lee, were crack users who obtained the drug from the [petitioner's] drug trafficking network.

"Lee testified that on January 6, 1999, the day before the Clarke and Brown murders, the [petitioner] and an associate, later identified as King, were at the house located at 200 Earl Avenue. According to Lee, the two men spent time in the dining room observing Clarke and Brown's residence. Lee further testified that another of the [petitioner's] associates, later identified as Gary

Garner, and the [petitioner's] brother, Adrian, also came by the house that day. At some point, King left Lee's residence and, thereafter, Lee observed Adrian and the [petitioner] conversing in the dining room.

"The [petitioner] and Adrian then entered the kitchen and 'cooked' some crack. Lee testified that the [petitioner] asked her if she would 'do him a favor . . . [and] kill the woman across the street . . . .' Lee, however, refused to do so. The [petitioner] thereupon asked Adrian if he would kill Clarke and her son. According to Lee, Adrian indicated that he would 'take care of it.'

"The [petitioner] then asked Lee to keep an eye on the 207 Earl Avenue address and to contact him when Clarke and Brown returned home. Lee agreed to do so, and the [petitioner] wrote down his beeper number for her to call. The [petitioner] then gave Lee a handful of crack cocaine as payment for her cooperation.

"The next day, when Lee saw Clarke and Brown return home, she telephoned the [petitioner's] beeper number and left her number. When the [petitioner] called her back, she informed him that Clarke and Brown had returned home. The [petitioner] said 'okay' and hung up the telephone. A few minutes later, Adrian arrived at Lee's residence holding a gun. Adrian greeted Lee and then immediately departed Lee's residence. Lee followed him.

"Adrian crossed the street and proceeded toward Clarke and Brown's house at 207 Earl Avenue, stopping first to speak to a lone occupant in a car that was parked in front of that residence. The occupant of the car subsequently was identified as Garner. Lee testified that Garner told her that if she 'said anything,' she 'was going to be next.'

"Adrian and Lee approached Clarke's residence and Lee rang the front doorbell while Adrian remained behind her. Lee heard a voice from inside the house ask, '[w]ho is it?' Lee responded, '[t]he girl across the street.' Clarke cracked open the door, at which time Adrian pushed past Lee and forced the door open. Lee testified that she heard the rustle of grocery bags, which were later found strewn across the floor, and the sounds of a struggle inside. When Lee entered the house, she saw Clarke and Brown running up the stairs trying to escape from Adrian, who was chasing them. According to Lee, once Clarke and Brown reached the top of the stairs, she heard a gunshot, and then heard Brown scream out, 'mommy, mommy, mommy, mommy,' from the top of the stairs. Lee then saw Adrian pursue Clarke into a bedroom and heard him mention something about Brown being a witness to a shooting. Lee, who by this time was at the top of the stairs, testified that she had heard another gunshot and, immediately thereafter, observed Adrian emerge from the bedroom. Lee further stated that she saw Adrian shoot Brown in the head.

Adrian then ran out of the house. Lee, who was still at the top of the stairs, testified that she initially had stood frozen, but eventually left to return to her residence at 200 Earl Avenue. On her way out of Clarke and Brown's house, Lee noticed Adrian was gone, as was the car in which Garner had been sitting. Louis Ellis, who also lived at 200 Earl Avenue, corroborated Lee's account, testifying that on the evening of the murders, he heard four or five gunshots, and shortly thereafter, he heard Lee run into the house breathing hard, as if out of breath.

"On April 14, 1999, the [petitioner] was arrested for the murders of Clarke and Brown and charged with one count of murder, two counts of capital felony—one for the murder of Brown, and the second for the double murder—and one count of conspiracy to commit murder. While incarcerated and awaiting trial, the [petitioner] inculpated himself to fellow inmates. Two of those inmates, Audrey Holeman and Thomas Kerr, testified that while each was incarcerated with the [petitioner], the [petitioner] had bragged about his involvement in the murders. Holman testified that he had overheard the [petitioner] tell another inmate that his brother would not testify against him because the [petitioner] had murdered one person, but his brother had murdered two, and that the [petitioner] was pleased with his brother because Adrian 'had done something righteous' for him 'that nobody else . . . would do . . . .' Kerr testified that the [petitioner] had told him that 'that bitch,' Clarke, rather than the [petitioner] himself, was responsible for both of the deaths, and that '[s]he should have known not to mess with him.' " (Footnotes in original). Id.

In June, 2000, after the guilt phase of the petitioner's capital felony jury trial, the petitioner was convicted on all counts.[6] Id., 355. During the penalty phase, however, the jury deadlocked on whether to sentence the petitioner to death. Id., 407. The state moved for a mistrial as to the penalty phase, but the court denied the state's motion and imposed a sentence of life imprisonment without the possibility of release. Id., 407–408. The petitioner subsequently appealed the verdict in his guilt phase while the state appealed the court's denial of its motion for a mistrial as to the penalty phase. Id., 345–348. On appeal, the Supreme Court affirmed the petitioner's convictions, reversed the court's denial of the state's motion for a mistrial, and remanded the case for a new penalty phase. Id. During the second penalty phase, the jury recommended and the court imposed a death penalty sentence. *State* v. *Peeler*, 320 Conn. 567, 572 n.3, 133 A.3d 864, cert. denied,    U.S.   , 137 S. Ct. 110, 196 L. Ed. 2d 89 (2016) (*Peeler III*). The petitioner appealed that sentence. Throughout the duration of the habeas proceeding, the petitioner's direct appeal of his death sentence remained pending and, as a result, the petitioner remained subject to a death penalty sentence. *State* v. *Peeler*, 321 Conn. 375, 376–77, 140 A.3d 811

(2016) (per curiam) (*Peeler IV*). During the pendency of the present appeal, the Supreme Court vacated the petitioner's death penalty sentence as unconstitutional in accordance with *State* v. *Santiago*, 318 Conn. 1, 122 A.3d 1 (2015). *Peeler IV*, supra, 377. The petitioner was resentenced to life in prison without the possibility of release. See id.

The petitioner initiated this habeas action on November 3, 2008. On April 4, 2014, the petitioner filed an eleven count amended habeas petition, in which he alleged ineffective assistance of trial and appellate counsel, constitutional violations based on his criminal trial schedule, and *Brady* violations by the state at his criminal trial. Relevant to the present appeal, the petitioner claimed that: (1) "[t]he failure [of appellate counsel] to challenge the denial of the motion to change venue on appeal [due to the amount of pretrial publicity his case received] constituted" ineffective assistance of counsel; (2) "[t]he expeditious trial schedule violated [his] fifth and sixth amendment rights to due process, compulsory process, to present a defense and to the effective assistance of counsel"; and (3) the state violated *Brady* by failing to disclose three recordings Lee made while wearing a concealed recording device for the Federal Bureau of Investigation (FBI), a recording made by a federal confidential informant of a conversation involving Ryan and Keene, and phone records from 200 Earl Avenue. After a trial, the habeas court issued a memorandum of decision denying the petitioner's habeas petition. This appeal followed. Additional facts will be set forth as necessary.

I

We begin with the petitioner's claim that the habeas court committed structural error when it denied his motion to proceed pro se. We conclude that the petitioner's claim lacks merit because he waived his right to self-representation.

After filing his petition for a writ of habeas corpus in 2008, the petitioner filed a motion for the appointment of counsel. The court granted the motion and appointed two special public defenders. In a letter dated December 29, 2010, the petitioner asked the court to replace habeas counsel with different counsel because they had met with him only once and had failed to amend his habeas petition, to hire an investigator, or to review his criminal trial transcripts. On January 7, 2011, the court held a hearing on the petitioner's motion. After hearing arguments from the petitioner and habeas counsel, the court denied the petitioner's motion to replace habeas counsel, agreeing that habeas counsel needed time to review the substantial record in the petitioner's case more thoroughly. It also asked habeas counsel and the petitioner to try to communicate better and repair their relationship.

In a letter dated April 19, 2011, the petitioner asked to proceed pro se. On May 26, 2011, the court held a hearing on the petitioner's motion. At the hearing, the petitioner argued that habeas counsel were still not communicating sufficiently with him or investigating his case. Habeas counsel explained that "this file is by far the largest file that [we] have ever dealt with" and that they were actively working on his case. The petitioner stated that the claim based on Lee's phone records was his "cardinal" claim; see Part IV C of this opinion; and the court engaged in a lengthy discussion with him about why habeas counsel were obligated to investigate beyond the narrow phone record issue. The court also explained that the reason habeas counsel were slow to respond to him was not because of their indifference to his case but because, as they previously explained, they had recently completed another homicide trial. Habeas counsel then shared with the court some of the logistical and legal issues associated with the petitioner's case.

The court proceeded to canvass the petitioner on his educational background. The petitioner stated that he graduated high school. When the court attempted to explore other aspects of his education, however, the petitioner repeated the reasons why he was dissatisfied with his current habeas counsel. The court interjected and cautioned that it and the court monitor were having difficulty following his rapid dialogue. The court again explained the enormity of the task presented by the habeas proceeding and asked the petitioner to be patient and to cooperate with habeas counsel. The petitioner then stated: "Well, Your Honor—Your Honor, let me [be] blunt, Your Honor. I filed this motion so I could represent myself. (Indiscernible)—represent myself, you know what I'm saying? I want to represent myself. I don't have any use—I don't want the use of the attorney who says—I want to represent myself (inaudible)." The court then stated that "given the nature of the issues in this case, given the nature of the proceeding and given your background, as much of it as you've given to me, that I don't feel that you can capably represent yourself. I don't think that you can effectively represent yourself."

The petitioner continued to argue that he was capable of representing himself, explaining that he attended a year of community college, during which he studied criminal justice. He also stated clearly and unequivocally on multiple occasions that he wanted to represent himself.[7] Nevertheless, the court expressed its concern that the petitioner was "not trained in the law" and did not have "any personal experience other than this case with the law." The court also observed that it was having "difficulty understanding some of the things [the petitioner] [had] been telling [it]," in part because the petitioner sometimes presented information in a "very

disjointed" manner and spoke "extremely fast." The court concluded that the petitioner was not able to represent himself "in a reasonably competent way" and that habeas counsel was adequately representing the petitioner's interests. Although the petitioner filed four more motions to replace habeas counsel over the next three years, at no time thereafter did the petitioner seek to represent himself.

On April 10, 2014, the court held a hearing on the petitioner's final motion for reconsideration of his motion to replace habeas counsel and habeas counsel's motion for a competency evaluation.[8] While the court discussed the petitioner's motion with the petitioner and habeas counsel, counsel for the respondent, the Commissioner of Correction, interjected, asking the court to clarify whether the petitioner was asking for a continuance, to replace counsel, or to represent himself. The court stated that it understood that he was seeking new counsel and asked the petitioner to confirm. The petitioner responded: "Right. Effective counsel. A person, person—a person who's going to afford me what I'm afforded under the sixth amendment. . . . My motion is clear. *I'm not saying I want to represent myself. I understand the difficulties, pitfalls that a self-represented client faces. I need an adequate attorney.* I don't need someone to say, well, here—we're going to—we're going to satisfy you, here's a habeas. No. I— this is serious, you see what I'm saying. You're not going to cover issues . . . ." (Emphasis added.) In response to those concerns, the court explained: "You don't get to choose who your trial counsel are. . . . That when counsel are appointed, as long as they are doing the job that they're expected to do, that's who—that's who you get. *Your choice is you can represent yourself or you can go forward with counsel, and if you go forward with counsel, they're the captain of the ship.*" (Emphasis added.) The petitioner acknowledged the court's remarks, but he gave no indication that he wanted to represent himself.

The court then admonished the petitioner that proceeding to trial on his petition while his appeal of his death sentence was pending could preclude him from raising similar claims with respect to his second penalty phase. The petitioner stated that he understood and then resumed his discussion about why he wanted to replace habeas counsel. Habeas counsel responded to his comments. In response to the petitioner's arguments, the court reminded the petitioner that "[t]hey've made conclusions that are strategic in nature as to how they want to pursue it, and that is their right if you want to be represented by counsel." The court explained that it believed that the petitioner was receiving effective assistance of counsel, and, therefore, the court denied his motion to replace counsel. The court then asked the petitioner: "Is it still your desire . . . to go forward [with the trial] . . . starting next week?" The petitioner

replied, "Yes, Your Honor." The petitioner then informed the court of an issue that he wanted the court to be aware of in advance of the habeas trial because he wanted to preserve the record for his appeal in case the court denied his petition.

Later in the proceeding, the issue arose, again, as to whether the petitioner should be proceeding with the habeas trial in light of the fact that his direct appeal of his death sentence was still pending. The court stated that it believed that the petitioner had competently chosen to proceed with the trial even though it might be against his best interests and the advice of counsel. In an abundance of caution, counsel for the respondent stated that "[i]f [the petitioner] withdraws this [habeas petition] today or tomorrow or next week, I'm not going to raise an abuse of the writ claim. I'm going to let him do that." The court similarly stated that although it was "usually . . . very stern with people who want to withdraw their petition on the eve of trial," it would permit the petitioner to withdraw his petition if he changed his mind before trial. The petitioner stated that he wished to proceed with the habeas trial.

On appeal, the petitioner claims that the court committed structural error when it improperly denied his motion to proceed pro se. The petitioner's argument assumes that the nonconstitutional right to self-representation in a habeas proceeding, found in Practice Book § 44-3, has the same force and effect as the constitutional right to self-representation in a criminal proceeding, embodied in the sixth amendment to the United States constitution.[9] The respondent acknowledges that the petitioner has a residual common-law right to self-representation at a habeas trial, but it argues that there is no basis under state or federal law for treating this right as equivalent to the constitutional right to self-representation.[10] The respondent argues therefore that the appropriate standard of review for a habeas court's denial of a motion to proceed pro se is abuse of discretion and that if this court concludes that the habeas court abused its discretion, it should consider whether this error was harmless. The respondent characterizes the court's ruling as "problematic," but it contends that any error was cured by the petitioner's subsequent waiver of his right to self-representation or, alternatively, was harmless. We conclude that regardless of whether the constitutional standard for the right to self-representation applies to the present case or the court abused its discretion by denying the petitioner's motion to proceed pro se, the petitioner is not entitled to relief because he explicitly waived his right to self-representation at the April 10, 2014 hearing.

We assume for the sake of argument only that the constitutional standards for the waiver of the right to self-representation apply to the present case.[11] It is well established that once a defendant clearly and unequivo-

cally invokes the right to self-representation, "the trial court *must* canvass the defendant to determine if the defendant's invocation of the right, and simultaneous waiver of his right to the assistance of counsel, is voluntary and intelligent." (Emphasis in original.) *State* v. *Braswell*, 318 Conn. 815, 828, 123 A.3d 835 (2015). If the court does not clearly and conclusively deny the defendant's request to represent himself, the defendant may subsequently waive his right to self-representation explicitly or implicitly through abandonment. Id., 843–844. If the court clearly and conclusively denies the defendant's request to represent himself, however, "the defendant does not waive his right to self-representation by subsequently acquiescing in being represented by counsel or by failing to reassert that right." Id., 844. That is, once a court clearly and conclusively denies a defendant's request to represent himself, we will no longer infer waiver from acquiescence or inaction. Instead, the defendant must explicitly relinquish or abandon his right to self-representation for his waiver to be effective.[12]

In the present case, it is undisputed that the petitioner clearly and unequivocally invoked his right to self-representation and that the court clearly and conclusively denied the petitioner's request to proceed pro se at the May 26, 2011 hearing. The parties dispute, however, whether the petitioner subsequently waived his right to self-representation at the April 10, 2014 hearing. The petitioner argues that he merely acquiesced to the appointment of counsel at the April 10, 2014 hearing because the court previously denied his motion to proceed pro se and because the habeas trial was scheduled for the next week. Accordingly, he argues that we cannot infer a waiver of the right to self-representation based on his conduct at the April 10, 2014 hearing. We disagree with the petitioner's characterization of his statements and conduct at the April 10, 2014 hearing. At the April 10, 2014 hearing, the petitioner clearly and unequivocally stated that he no longer wanted to represent himself. He further explained that the reason he did not want to represent himself anymore was that he now understood "the difficulties [and] pitfalls that a self-represented client faces" and that he "need[ed] an adequate attorney." The court, in an abundance of caution, told the petitioner that he had the option of representing himself, but the petitioner gave no indication thereafter that he had any desire to represent himself. We find this significant, in part, because the petitioner's conduct throughout the habeas proceeding demonstrates that the petitioner is capable and willing to advocate forcefully and zealously on his own behalf when the issue is important to him.

We are also not persuaded that the petitioner was deterred from representing himself by the approaching trial date. At the April 10, 2014 hearing, the court and the respondent expressly stated that they were willing

to allow the petitioner to withdraw his petition and forego trial at that time without any adverse consequences. Although their proffered reason for permitting the petitioner to withdraw his petition was his pending direct appeal of his death sentence, it is reasonable to assume that if the petitioner truly wished to represent himself, he would have accepted the court's offer so that he could avoid proceeding to trial with the unwanted assistance of counsel.

Accordingly, we conclude that because the petitioner explicitly waived his right to self-representation, he is not entitled to reversal of the court's decision and a new habeas trial.

## II

The petitioner's next claim is that the court erroneously concluded that his claim that he "was denied his due process and fair trial rights by the trial court's repeated denials of his attorneys' requests for sufficient time to prepare a death penalty case" had been procedurally defaulted. The petitioner argues that because his due process claim "was premature" at the time of his direct appeal, it was not procedurally defaulted by his failure to raise it on direct appeal. The respondent counters that the petitioner's claim is unreviewable because the petitioner argued before the habeas court only that "[t]he failure to appeal the issue was due to ineffective assistance of appellate counsel . . . ." We agree with the respondent.

"When a respondent seeks to raise an affirmative defense of procedural default, the rules of practice require that he or she must file a return to the habeas petition 'alleg[ing] any facts in support of any claim of procedural default . . . or any other claim that the petitioner is not entitled to relief.' Practice Book § 23-30 (b). 'If the return alleges any defense or claim that the petitioner is not entitled to relief, and such allegations are not put in dispute by the petition, the petitioner shall file a reply.' Practice Book § 23-31 (a). 'The reply shall allege any facts and assert any cause and prejudice claimed to permit review of any issue despite any claimed procedural default.' Practice Book § 23-31 (c)."[13] *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 567, 941 A.2d 248 (2008). In the present case, the respondent alleged in the return that the petitioner's due process claim was procedurally defaulted. In his reply, the petitioner argued that "[t]he failure to appeal the issue was due to ineffective assistance of appellate counsel, which vitiates a procedural default claim." Now, for the first time on appeal, the petitioner argues that appellate counsel "was not ineffective" for not raising his due process claim on appeal because it "was premature" at that time.

"It is well settled that this court is not bound to consider any claimed error unless it appears on the

record that the question was distinctly raised at trial and was ruled upon and decided by the court adversely to the appellant's claim. . . . It is equally well settled that a party cannot submit a case to the trial court on one theory and then seek a reversal in the reviewing court on another." (Citations omitted; internal quotation marks omitted). *Mitchell* v. *Commissioner of Correction*, 156 Conn. App. 402, 408–409, 114 A.3d 168, cert. denied, 317 Conn. 904, 114 A.3d 1220 (2015). To review such a newly articulated claim, "would amount to an ambuscade of the [habeas] judge." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 285 Conn. 580.

Accordingly, because the court was never provided with an opportunity to make any factual or legal findings with respect to the petitioner's claim that the due process claim was premature at the time of the direct appeal, we decline to review it now for the first time on appeal.[14]

### III

The petitioner's third claim on appeal is that appellate counsel provided ineffective assistance when he failed to challenge the trial court's denial of his motion to change venue. We agree with the habeas court that appellate counsel rendered effective assistance on appeal.

To succeed on a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires that a petitioner satisfy both a "performance prong" and a "prejudice prong." To satisfy the performance prong, "a [petitioner] must show that counsel's conduct fell below an objective standard of reasonableness for competent attorneys [as measured by prevailing professional norms]." *Davis* v. *Commissioner of Correction*, 319 Conn. 548, 555, 126 A.3d 538 (2015), cert. denied sub nom. *Semple* v. *Davis*,    U.S.   , 136 S. Ct. 1676, 194 L. Ed. 2d 801 (2016); *Iovieno* v. *Commissioner of Correction*, 242 Conn. 689, 703, 699 A.2d 1003 (1997). To satisfy the prejudice prong, "a [petitioner] must show a reasonable probability that the outcome of the proceeding would have been different but for counsel's errors." *Davis* v. *Commissioner of Correction*, supra, 555. In the context of a claim of ineffective assistance of appellate counsel, the petitioner must establish that "there is a reasonable probability that, but for appellate counsel's failure to raise the issue on appeal, the petitioner would have prevailed in his direct appeal, i.e., reversal of his conviction or granting of a new trial." *Small* v. *Commissioner of Correction*, 286 Conn. 707, 722, 724, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008). "The claim will succeed only if both [*Strickland*] prongs are satisfied. . . . It is well

settled that [a] reviewing court can find against a petitioner on *either* ground, whichever is easier." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 713.

In the present case, the petitioner's claim is based on appellate counsel's failure to challenge on appeal the trial court's denial of his motion for a change of venue and to argue that his criminal trial was tainted by prejudicial pretrial publicity. "For an appellate court to reverse a conviction on the [ground] of prejudicial pretrial publicity, a defendant generally must prove actual juror prejudice. . . . A defendant need not, however, show actual prejudice in extreme circumstances whe[n] there has been inherently prejudicial publicity such as to make the possibility of prejudice highly likely or almost unavoidable." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 222, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). The burden of proving inherent prejudice is an exacting one. Inherent prejudice "attends only the extreme case"; *Skilling* v. *United States*, 561 U.S. 358, 381, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010); in which the pervasive or inflammatory pretrial publicity created a " 'circus atmosphere' "; *State* v. *Townsend*, 211 Conn. 215, 226, 558 A.2d 669 (1989); or "utterly corrupted" the proceeding. (Internal quotation marks omitted.) *State* v. *Piskorski*, 177 Conn. 677, 688, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979).

"A defendant cannot rely . . . on the mere fact of extensive pretrial news coverage to establish the existence of inherently prejudicial publicity. Prominence does not, in itself, prove prejudice." *State* v. *Reynolds*, supra, 264 Conn. 223. "[J]urors need not be totally ignorant of the facts and issues involved in a criminal trial and the fact that some jurors have some prior knowledge about the case does not itself constitute identifiable jury prejudice." (Internal quotation marks omitted.) Id., 224. Ordinarily, "there is no reason to believe that any influence of the pretrial publicity could not have been overcome by the voir dire process." Id. (no inherent prejudice where, inter alia, two jurors were selected in the two days of jury selection before the defendant waived his right to a jury trial and elected to be tried by the court); see also *Beck* v. *Washington*, 369 U.S. 541, 555–58, 82 S. Ct. 955, 8 L. Ed. 2d 98 (1962) (upholding denial of motion for change of venue because process during jury selection ensured that each juror chosen was impartial). That is, a reviewing court may properly conclude that a defendant has failed to meet his heavy burden of proving inherent prejudice when "the voir dire [demonstrates] that an impartial jury was actually impaneled in an appellant's case." *United States* v. *O'Keefe*, 722 F.2d 1175, 1180 (5th Cir. 1983).[15]

With these legal principles in mind, we turn to the facts that are relevant to this claim. During the pendency of the petitioner's case for the Clarke-Brown murders, the petitioner was charged in two additional criminal cases. In state court, the petitioner was charged with attempted murder in violation of General Statutes § 53a-49 (a) and General Statutes (Rev. to 1997) § 53a-54a (a), two counts of risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 (1), and murder in violation of General Statutes (Rev. to 1997) § 53a-54a (a) in connection with the two shooting incidents involving Snead (the Snead case). *State* v. *Peeler*, 265 Conn. 460, 461–62, 828 A.2d 1216 (2003), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004) (*Peeler I*); *Peeler III*, supra, 320 Conn. 570. In federal court, the petitioner was charged with conspiracy to possess with intent to distribute and distribute multi-kilogram quantities of cocaine base in violation of 21 U.S.C. §§ 841 (a) (1) and 846 for his drug trafficking business (the federal narcotics case). *United States* v. *Kennedy*, 21 Fed. Appx. 82, 84–85 (2d Cir. 2001) (summary order). From September into October 1999, the petitioner was tried and convicted in the Snead case. *Peeler I*, supra, 462; *Peeler III*, supra, 570. In November, 1999, the petitioner was tried and convicted in the federal narcotics case. *United States* v. *Kennedy*, supra, 85.

The petitioner's successive trials and the pending Clarke-Brown trial drew significant media attention. As a result, the petitioner filed a motion to change venue on December 7, 1999 based on the inherently prejudicial nature of the pretrial publicity. In support of that motion, the petitioner attached several news articles about his cases and a change of venue study based on polling data. After a hearing, the court denied the petitioner's motion without prejudice. The court indicated that it would attempt to select a jury before determining whether pretrial publicity had poisoned the venire and then, if necessary, it would reconsider the motion to change venue. Over the course of approximately three months, the petitioner successfully selected a jury without exhausting all of his peremptory challenges. The petitioner did not renew his motion to change venue.

At the petitioner's first trial, the jury unanimously found him guilty as charged but deadlocked on whether to sentence him to death. *Peeler II*, supra, 271 Conn. 355, 407. After the court denied the state's motion for a mistrial as to the penalty phase and imposed a sentence of life imprisonment without the possibility of release, the state appealed the court's denial of its motion for a mistrial while the petitioner appealed the verdict. Id., 345–348. The petitioner raised five issues on appeal and provided four alternative bases for affirming the sentence of life imprisonment. Id. He did not challenge the court's denial of his motion to change venue.

On appeal, the Supreme Court affirmed the petitioner's convictions, reversed the court's denial of the state's motion for a mistrial, and remanded the case for a new penalty phase. Id., 345, 423. During the second penalty phase, the jury recommended and the court imposed a death penalty sentence, which, at the time of the petitioner's habeas trial, was constitutional. See *Peeler IV*, supra, 321 Conn. 377.

The petitioner's appellate counsel, who continued to represent him in his direct appeal of his death sentence, testified at the habeas trial. He explained that in preparation for the petitioner's first direct appeal he reviewed the entire record and "every piece of paper in [trial counsels'] file." Specifically, he read the memorandum in support of the motion to change venue "many times," the newspaper articles and study attached to the motion, "a large volume, like a couple inches of Xerox copies of newspaper articles" that were introduced as an exhibit in the Snead trial, the transcripts from the hearing on the motion to change venue, and the transcripts from voir dire. Appellate counsel stated that he ultimately decided not to challenge the court's denial of the motion to change venue. He believed that not exhausting peremptory challenges was "pretty much fatal" to raising a claim of actual prejudice. He acknowledged that he could have challenged the court's ruling by relying on a line of cases in which the court discussed "the concept of presumed prejudice that flows from . . . heavy pretrial publicity . . . ." He believed, however, based on his review of these cases and the fact that "the defendant lost in every single one of those cases," that such a claim would be "hopeless."

Appellate counsel then testified that he now believes that he should have considered more seriously raising a prejudicial publicity claim based on the inherent prejudice standard. Appellate counsel explained that at the time of the petitioner's appeal "[he] knew that [certain United States Supreme Court pretrial publicity cases] existed, but [he] didn't read them. . . . [He] read summaries of what the law was about pretrial publicity, which discussed these cases." When the issue arose in another appeal, he developed "an inkling" that "the case law here is different than [he] thought it was" at the time of the petitioner's appeal and that "there was another viable argument about change of venue." Because he dismissed the merits of the venue issue, appellate counsel testified that he approached reviewing the record in the wrong manner. When reviewing the voir dire transcripts for appeal, he focused on whether the court had erroneously denied any challenges for cause and whether the petitioner used all of his peremptory challenges. Appellate counsel explained that what he should have done was read all of the news articles on the petitioner and then, with those articles and the inherent prejudice standard in mind, reviewed the voir dire transcripts to determine

whether the voir dire was adequate to detect express or latent prejudice against the petitioner.

Nevertheless, appellate counsel acknowledged that he was limited in the number of issues he could raise on appeal, that he explored the venue issue when preparing the appeal, and that he did not think that the venue claim was a viable issue based on his research. Appellate counsel also recognized that "in almost every case, I have a dozen issues, and I go with the three best ones" so the tactical decision to drop one issue in favor of another is "an everyday decision you have to make as an appellate lawyer." He further acknowledged that in the petitioner's appeal in particular he had to evaluate the strongest issues for reversing the verdict in the guilt phase and the strongest arguments for affirming the court's denial of the state's motion for a mistrial in the first penalty phase. For appellate counsel, "guilt [became] secondary to penalty" because at the time "[he] was trying to save [the petitioner's] life," and he dedicated "well over half" the brief to alternative bases for affirming the sentence of life imprisonment.

The court concluded that appellate counsel did not perform deficiently and therefore rejected the petitioner's claim of ineffective assistance of appellate counsel. The court found that appellate counsel had "thoroughly familiarized himself with the motion for change of venue, the law governing such a claim and the transcripts pertinent to the issue. He [then] deliberately chose to discard that issue as an appellate claim." The court acknowledged that, given the unsuccessful outcome of the petitioner's direct appeal, appellate counsel's regret at "having elected to forgo the denial of the change of venue motion as an appellate issue . . . is understandable. However, [appellate counsel's] second-guessing his own decision [failed] to persuade [it] that his decision at the time he made it fell below professional standards." The court agreed with trial counsel's observation that the trial court "exhibited deep sensitivity and thoroughness in ferreting out the potential [prejudicial] effects from pretrial publicity." The court further observed that to its "knowledge, no Connecticut decision has reversed a criminal conviction based on inherent prejudice." As a result, the court believed that raising an implied prejudice "claim would have been a weak one at best, and the availability of unused peremptory challenges undermined any demonstration of actual prejudice."

On appeal, the petitioner claims that appellate counsel performed deficiently by failing to research and to argue a claim based on the inherent prejudice standard. The respondent replies that even if appellate counsel performed deficiently, the petitioner cannot establish prejudice because "the Supreme Court has made clear that before a defendant can obtain relief for being tried by a biased panel, he 'must subsequently [exhaust] all

of his or her peremptory challenges,' " and he did not. After carefully reviewing the record, we agree with the habeas court that appellate counsel's "second-guessing" of his tactical decisions on appeal is insufficient to establish deficient performance.

"[Although] an appellate advocate must provide effective assistance, he is not under an obligation to raise every conceivable issue." (Internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 87 Conn. App. 560, 563, 867 A.2d 51, cert. denied, 273 Conn. 934, 875 A.2d 543 (2005). "The determination of which issues to present, and which issues not to present, on an appeal is by its nature a determination committed to the expertise of appellate counsel, and not to his client. . . . By that determination, appellate counsel seeks to focus the concern of the appellate court on those issues which he deems to be most persuasive, and thus does appellate counsel most effectively present his client's appeal. . . . [A] habeas court will not, with the benefit of hindsight, second-guess the tactical decisions of appellate counsel. Legal contentions, like the currency, depreciate through over-issue. . . . [M]ultiplying assignments will dilute and weaken a good case and will not save a bad one. . . . The effect of adding weak arguments will be to dilute the force of the stronger ones. . . . [I]t is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (Citations omitted; internal quotation marks omitted.) *Camacho* v. *Commissioner of Correction*, 148 Conn. App. 488, 496–97, 84 A.3d 1246, cert. denied, 311 Conn. 937, 88 A.3d 1227 (2014).

In the present case, appellate counsel testified that he thoroughly reviewed the record in the petitioner's case looking for the best claims for his appeal. Appellate counsel recognized that the denial of the motion to change venue was a potential issue for appeal. He therefore made a preliminary investigation into the merits of a venue claim, reviewing the record and relevant case law. Based on that preliminary investigation and his own reasonable professional judgment, he decided to focus his time and attention on more meritorious claims.[16] See *Hinton* v. *Alabama*, U.S. , 134 S. Ct. 1081, 1088, 188 L. Ed. 2d 1 (2014) ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation"). This tactical decision was reasonable given the proce-

dural posture of the petitioner's case and the difficulty of raising a successful implied prejudice claim. As the court correctly observed, neither this court nor our Supreme Court has ever reversed a conviction based on inherent prejudice.

Accordingly, we conclude that because the petitioner failed to establish that appellate counsel rendered deficient performance, the habeas court properly denied his ineffective assistance of appellate counsel claim.

IV

The petitioner's final claim on appeal is that the state violated *Brady* by failing to disclose three recordings Lee made while wearing a concealed recording device for the FBI (Lee recordings), a recording made by a federal confidential informant of a conversation with Ryan and Keene (CI recording), and phone records from 200 Earl Avenue (Lee's phone records). We conclude that the state was not required to disclose the Lee recordings, the CI recording, or Lee's phone records under *Brady*.

The law governing the state's obligation to disclose exculpatory evidence to the defense is well established. "It is the duty of the state voluntarily to disclose material in its exclusive possession which would be exonerative or helpful to the defense . . . ." *State* v. *Dolphin*, 195 Conn. 444, 455, 488 A.2d 812, cert. denied, 474 U.S. 833, 106 S. Ct. 103, 88 L. Ed. 2d 84 (1985). "The prosecution's duty to disclose applies to all material and exculpatory evidence that is within its possession or available to it . . . and that the prosecution knew or should have known was exculpatory." (Citations omitted; emphasis omitted.) *Demers* v. *State*, 209 Conn. 143, 150–151, 547 A.2d 28 (1988). To prove a *Brady* violation, therefore, the petitioner must establish: (1) that the state suppressed evidence (2) that was favorable to the defense and (3) material either to guilt or to punishment. *State* v. *Ouellette*, 295 Conn. 173, 185, 989 A.2d 1048 (2010). If the petitioner fails "to meet his burden as to one of the three prongs of the *Brady* test, then we must conclude that a *Brady* violation has not occurred." *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 296, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009).

*Brady*'s definition of evidence favorable to an accused encompasses both exculpatory evidence and impeachment evidence, which "broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." (Internal quotation marks omitted). *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 370, 71 A.3d 512 (2013).

The test for materiality is whether the suppressed evidence in the context of the entire record creates "a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different." (Internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 361, 696 A.2d 944 (1997). "[T]he mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial, however, does not establish materiality in the constitutional sense." (Emphasis in original; internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 546, 747 A.2d 487 (2000). "The question [of materiality] is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." (Internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 370–71.

"Whether the petitioner was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) *Davis* v. *Commissioner of Correction*, 140 Conn. App. 597, 606, 59 A.3d 403, cert. denied, 308 Conn. 920, 62 A.3d 1133 (2013). Additionally, "a trial court's determination as to materiality under *Brady* presents a mixed question of law and fact subject to plenary review . . . ." *State* v. *Ortiz*, 280 Conn. 686, 720, 911 A.2d 1055 (2006). We will not disturb a habeas court's findings with respect to the underlying historical facts or whether the evidence was suppressed unless the findings are clearly erroneous. Id.; see *State* v. *Ross*, 251 Conn. 579, 592, 742 A.2d 312 (1999).

A

We first address the petitioner's claim that the state violated *Brady* when it failed to disclose the Lee recordings.

At the time of the Clark-Browne murders, Lee lived at 200 Earl Avenue with Kathy Esposito, Norman Williams, and others. During the initial investigation into the Clarke-Brown murders, Lee disavowed any involvement and, instead, implicated Esposito. In furtherance of that lie, Lee agreed to assist federal authorities in their investigation of Esposito by engaging in conversations with the residents of 200 Earl Avenue about the Clarke-Brown murders while wearing a concealed recording device. The majority of the conversations in the recordings involve Lee expressing her concerns about being implicated in the murders, attempting to talk to Esposito about the murders, and receiving advice from Williams on how to avoid the continued inquiries by the police about the murders. Sometime thereafter, Special Agent James Lawton, the lead agent for the joint state and federal investigation into the petitioner's drug trafficking business, testified about the contents

of the Lee recordings before a federal grand jury.

At the habeas trial, Senior Assistant States Attorney Joseph Corradino, who prosecuted the petitioner in the Clarke-Brown case, testified that he did not know about the Lee recordings until after the petitioner's criminal trial and that he did not subsequently disclose them to the petitioner because he believed that they were inculpatory. The petitioner's trial counsel, John Walkley and William Koch,[17] testified that they did not remember knowing about the Lee recordings at the time of the petitioner's first criminal trial; although, they remembered receiving a copy of Lawton's grand jury testimony and acknowledged that they likely reviewed it because of Lawton's role in the investigation.

The court found that the Lee recordings were not exculpatory and that they would not have been useful impeachment evidence at the petitioner's criminal trial. Therefore, the state was not obligated to disclose them. The court noted that "[i]t must be kept in mind that Lee was aware of the wire and part of the subterfuge designed by law enforcement to elicit information from the occupants of [200 Earl Avenue]. Most of the dialogue concerned ways to avoid having to respond to police inquiries about the murders."

Having carefully reviewed the record, we conclude that there is no reasonable probability that the disclosure of the Lee recordings would have put the petitioner's entire case in such a different light as to undermine confidence in the jury's verdict. See *Kyles* v. *Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Accordingly, the Lee recordings are immaterial and the state was not required to disclose them.

"It is well established that impeachment evidence may be crucial to a defense, especially when the state's case hinges entirely upon the credibility of certain key witnesses. . . . The rule laid out in *Brady* requiring disclosure of exculpatory evidence applies to materials that might well alter . . . the credibility of a crucial prosecution witness. . . . Still, the seminal test remains whether there exists a reasonable possibility that the outcome of the proceeding would have been different had the evidence been disclosed to the defense." (Internal quotation marks omitted.) *State* v. *Esposito*, 235 Conn. 802, 815–16, 670 A.2d 301 (1996). If the evidence in question "would not have provided the defendant with any significant impeachment material that was not already available and used by him"; id., 819; it is immaterial under *Brady*. This is true even if "the [evidence's] cumulative effect may have lent some additional support to the defendant's attack on [a witness]." Id. "[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles* v. *Whitley*, supra, 514 U.S. 436–37.

The petitioner argues that the Lee recordings were material and noncumulative because they "were qualitatively different from the evidence of Lee's psychiatric history or the conflicting statements made by Lee and Williams during the investigation."[18] The respondent disagrees, arguing that the Lee recordings "were immaterial because there was ample confrontation at the original trial to expose Lee's bias and the fact that she, as the petitioner declares, 'desperately wanted to please law enforcement.' " We agree with the respondent.

"In analyzing a *Brady* claim, the courts must avoid concentrating on the suppressed evidence in isolation. Rather, we must place it in the context of the entire record. . . . Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." (Internal quotation marks omitted.) *State* v. *Marra*, 295 Conn. 74, 90 n.10, 988 A.2d 865 (2010). The record reveals that defense counsel comprehensively impeached Lee's credibility and motives for testifying. The jury was exposed to Lee's prior inconsistent statements, her letters in which she admitted to lying both to the police and in court about being involved in the Clarke-Brown murders,[19] her letters in which stated that she was being pressured by police to inculpate the petitioner, her cooperation agreement with the federal government, her plea agreement with the state, the benefits she received from the state, her infatuation with the detectives investigating the Clarke-Brown murders, her criminal history, and her crack addiction. Although disclosure of the Lee recordings would have permitted further development of this line of questioning by defense counsel, our review of the record demonstrates that defense counsel extensively and thoroughly impeached Lee. Moreover, although Lee's testimony was significant, it was not dispositive. The other evidence inculpating the petitioner in the Clarke-Brown murders further bolsters our confidence in the jury's verdict.

Accordingly, we conclude that the Lee recordings are not *Brady* material and, therefore, the state was not required to disclose them.

B

We next address the petitioner's claim that the state violated *Brady* when it failed to disclose the CI recording.

As part of the joint investigation into the petitioner's drug trafficking business, a FBI confidential informant, also known as a CI, agreed to engage Keene, the petitioner's girlfriend and mother of his children, and Ryan, the petitioner's cousin, in a conversation while wearing a concealed recording device. During that conversation, Keene stated that she directed the petitioner's brother, Adrian, to tell the petitioner to stop sending her letters

from jail with other people's names in them. She also stated that she thought David Jennings, who cooked crack for the petitioner, was an FBI informant and that someone needed to kill him. Ryan agreed that "he needs to die." Keene and Ryan then discussed Lee, and Keene stated "that bitch Josephine [Lee] needs to die." Nevertheless, both agreed that there was no way to kill Lee while she was incarcerated.

At the petitioner's criminal trial, Keene and Ryan testified for the state about their relationship with the petitioner and certain inculpatory statements he made to them about the Clarke-Brown murders. Keene acknowledged that she was currently incarcerated on federal narcotics conspiracy charges and that she was testifying against the petitioner in accordance with a cooperation agreement that she had entered into with the federal government.[20] She stated that she had known the petitioner since she was eleven years old, that they had three children together, and that the petitioner usually told her everything. She admitted to having knowledge of the petitioner's drug trafficking business, and she testified that she agreed to help Snead resolve his dispute with the petitioner. She further testified about inculpatory statements the petitioner made to her about his plans to kill Snead, his attempted murder of Snead, his murdering Snead, and his intent to kill state's witnesses in the Snead case. Keene stated that she had never met Lee but that she had heard the petitioner talk about her.

Keene further stated that she was not involved in the attempts to kill witnesses. Nevertheless, when Kybarris Taylor testified that the petitioner offered him $10,000 to kill two "nobodies," he stated that Keene drove him to and from that meeting and was present with the two of them in the car for a portion of their discussion. Taylor testified that while they were driving away from the meeting, and after he refused the petitioner's offer, Keene asked: "Why don't you do that favor for him? You know, his life is at risk, you know, his life is in danger?" Keene insisted that she was not involved in this meeting and that this conversation never happened.

Like Keene, Ryan testified that he was currently incarcerated on federal narcotics conspiracy charges and that he was testifying against the petitioner in accordance with a cooperation agreement that he had entered into with the federal government.[21] He also testified that in exchange for his testimony he had received immunity from the state for his involvement in the petitioner's drug trafficking business. Ryan stated that he was the petitioner's cousin and had known the petitioner his entire life. Ryan admitted to packaging crack for the petitioner, to being present when the petitioner first attempted to murder Snead (and that he saw two boys in the vehicle with Snead), and to being at 200 Earl

Avenue with the petitioner, participating in his drug trafficking business. Ryan further testified about inculpatory statements the petitioner made about murdering Snead, about his intent to kill Clarke and Brown, and about the Clarke-Brown murders.

At the habeas trial, Corradino testified that he was not aware of the CI recording until it was referenced in the petitioner's amended habeas petition, and he did not read the summary of the CI recording until the habeas trial. Walkley and Koch again acknowledged that they likely reviewed Lawton's grand jury testimony, in which he referenced the CI recording, but neither recalled knowing about it at the time of trial.

The habeas court concluded that the CI recording was not *Brady* material. The court observed: "The state's murder case was premised on the Peeler family running a major cocaine distribution network in the Bridgeport area, and the extreme efforts employed by that organization to maintain that network and remove threats to members of the group by brutally murdering antagonists, including a young child. Rather than undermining the state's case, the recorded conversations reinforced the prosecution's characterization of the enterprise and the extent to which this gang's members were willing to go to preserve the business and insulate themselves from the reach of the law. To call this evidence exculpatory puts an untenable spin on what is, in reality, evidence which corroborated the state's case."

On appeal, the petitioner contends that the CI recording would have been favorable to his defense because it "would have painted a very different picture of both state's witnesses." He believes that the "recording emphasizes the strong motivation both witnesses had to say whatever they thought the state wanted in order to secure plea agreements. Had the jury heard about the recording, it might have disbelieved Keene and [Ryan] in particular, and perhaps the other informants and . . . concluded that, at worst, Peeler was a coconspirator in the murders."

We disagree with the petitioner's characterization of the CI recording. The CI recording is not exculpatory, as it has no tendency to establish the petitioner's lack of guilt in the Clarke-Brown murders. Rather, it establishes that the petitioner's longtime girlfriend and his cousin, both of whom were involved in his drug trafficking business, were comfortable discussing the murder of potential state's witnesses *for his benefit*. In a trial where the state's theory of the case was that the petitioner convinced his brother to murder an eight year old witness to shield himself from prosecution for another murder and to protect his ongoing drug trafficking business, this evidence was compellingly unfavorable and of scant impeachment value.

Even assuming arguendo that the CI recording was

favorable to the petitioner as impeachment evidence, it is also immaterial. The jury was aware that Keene and Ryan were testifying with the hope that they would in fact receive minimal sentences under their federal cooperation agreements. Consequently, additional evidence that Keene and Ryan were motivated to testify to avoid further criminal prosecution is cumulative as to bias and interest and, therefore, immaterial under *Brady*.[22] See *State* v. *Jones*, 60 Conn. App. 866, 877–78, 761 A.2d 789 (2000), cert. denied, 255 Conn. 942, 769 A.2d 59 (2001) (evidence in robbery prosecution that state's witness was arrested for larceny day after robbery in conjunction with unrelated incident was "cumulative as to bias and interest, since the jury was aware that in exchange for his testimony, [the witness] was charged only with conspiracy to commit robbery in the third degree with a recommendation for a three year sentence for participating in the robbery of the automotive store").

Accordingly, we conclude that the CI recording is not *Brady* material and, therefore, the state was not required to disclose it.

C

The petitioner's final claim is that the state violated *Brady* when it failed to disclose Lee's phone records from the day of the Clarke-Brown murders.

In 1999, Southern New England Telephone (SNET), which served the landline for 200 Earl Avenue, retained two types of phone records relevant to this appeal. First, it retained records for calls for which there was a subscriber charge, such as a toll call or a local-to-local call for which an extra fee was charged. Second, it retained records for routine local-to-local calls for which there were no subscriber charges. SNET had a policy to retain paper documents for their records for one year and then to purge their files by shredding the documents.

The state, federal investigators, and defense counsel incorrectly believed at the time of the Clarke-Brown investigation and trial that routine local-to-local calls were not retained by SNET unless a pen register or trap and trace device had been installed on that particular phone because SNET never revealed that capability to them.[23] Rather, SNET had a "strict policy" of providing only the precise information solicited in a subpoena or search warrant without educating law enforcement and others as to the existence of other potentially useful records within its database. Consequently, unless the requesting party specifically demanded routine local-to-local call records, SNET would merely supply the subscriber charge data that appeared in the customer's phone bill.

As part of the federal investigation into the petitioner's drug trafficking business, the FBI subpoenaed the

phone records for 200 Earl Avenue from SNET. Because they did not specifically request routine local-to-local phone records, they received only phone records for which there was a subscriber charge. Those subpoenaed phone records did not reflect the call that Lee made to the petitioner on January 7, 1999, the day of the Clarke-Brown murders. These records were subsequently disclosed to the state. Any record of local-to-local phone calls made on January 7, 1999 from 200 Earl Avenue to the petitioner would have been destroyed before this habeas action commenced pursuant to SNET's retention protocol.

The habeas court concluded that the state did not violate *Brady* with respect to Lee's phone records because the lack of knowledge about SNET's actual retention capacity "was pervasive in legal circles and reasonable . . . no agency of the state ever possessed or controlled [the unpreserved local-to-local records], and there is no credible proof that the [subpoenaed or local-to-local phone] records contained exculpatory material."

The petitioner's claim on appeal encompasses both the subpoenaed phone records and the unpreserved local-to-local phone records. With respect to the subpoenaed phone records, the petitioner argues that they constituted material, exculpatory evidence because they did not list the phone call Lee purportedly made to the petitioner on January 7, 1999 to tell him that Clarke and Brown had returned home. With respect to the unpreserved local-to-local phone records, the petitioner argues that *Brady* required the state to obtain and disclose them because they might have shown that Lee did not call the petitioner on January 7, 1999. We disagree.

In the present case, the absence of a call from Lee to the petitioner in the subpoenaed records is meaningless. SNET did not list local-to-local calls in the type of records the FBI subpoenaed unless the call generated a subscriber charge. The petitioner offered no evidence that a call from Lee to him on January 7, 1999 would have generated a subscriber charge, and, as a result, it would be speculative to conclude that any call from Lee to the petitioner on January 7, 1999 should have been documented in the subpoenaed phone records. Accordingly, there is no reasonable probability that had the subpoenaed phone records been disclosed to the petitioner, the result of his criminal trial would have been different.

It is also unknown whether the unpreserved local-to-local phone records would have supported or contradicted Lee's testimony that she called the petitioner to tell him that Clarke and Brown had returned home on January 7, 1999. That fact alone is fatal to the petitioner's *Brady* claim. See *Taft* v. *Commissioner of Correction*, 159 Conn. App. 537, 554, 124 A.3d 1, cert. denied,

320 Conn. 910, 128 A.3d 954 (2015) (petitioner cannot establish that trial counsel's deficient performance prejudiced him absent proof of what, if any, impeachment evidence missing transcripts contained); *Lewis* v. *Commissioner of Correction*, 116 Conn. App. 400, 408, 975 A.2d 740, cert. denied 294 Conn. 908, 982 A.2d 1082 (2009) (no *Brady* violation where there was no evidence of agreement between state and state's witness). Nevertheless, even if we were to assume *arguendo* that the unpreserved local-to-local phone records were favorable to the petitioner, the state was still not required to obtain them from SNET and disclose them. *Brady* requires the state to disclose all evidence in its exclusive possession that is favorable to the defendant and material. *State* v. *Dolphin*, supra, 195 Conn. 455. *Brady* does not require the state to obtain and disclose evidence in the exclusive possession of a private, third party entity. See *United States* v. *Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) ("[c]learly the government cannot be required to produce that which it does not control and it never possessed or inspected" [internal quotation marks omitted]); see also *Demers* v. *State*, supra, 209 Conn. 151–53 (under *Brady*, state has duty to disclose evidence in *its* or *its investigative agencies'* possession).

Accordingly, we conclude that the state was not required to disclose the Lee phone records under *Brady*.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The habeas court granted his petition for certification to appeal. See General Statutes § 52-470.

[2] The petitioner also asks this court to exercise its supervisory authority to grant him a new criminal trial to remedy the "distorting effects of a death penalty prosecution." "It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 764, 91 A.3d 862 (2014). Nevertheless, "[t]he exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) Id., 765. We are not convinced that it is necessary to the due administration of justice for us to invoke our supervisory authority in the present case. Our supervisory authority is meant to be utilized sparingly and only in extraordinary circumstances, which are not present here.

[3] "We hereinafter refer to this incident as the Lindley Avenue shooting." *Peeler II*, supra, 271 Conn. 349 n.11.

[4] "Specifically, Keene testified that the [petitioner] first told her to move in November, 1998. She stated that, '[the petitioner] told me shit was starting to get hot and he [was] about to start getting witnesses, witnesses—wait a minute. First he told me witnesses [were] about to get killed.' She further testified that the [petitioner] warned her again on Christmas day in 1998 stating: '[The petitioner] was talking in an opening to everybody, but, like me mainly . . . I'm telling her she better move. Shit about to start getting hot, meaning people starting to get killed.' Finally, Keene testified that, when the [petitioner] spoke about killing witnesses, he quoted the following lyrics from a rap song: '[N]iggers want to lie, niggers wonder why, niggers gonna die.' " *Peeler II*, supra, 271 Conn. 351 n.12.

[5] "Although there was no direct evidence presented at trial that the [petitioner] knew that the state had used the shell casings left behind at the

Lindley Avenue shooting to link that shooting to Snead's murder, the jury reasonably could have inferred that while preparing his defense to the Snead murder case, the [petitioner] was informed by his counsel that the state intended to use the discarded shell casings to link him to Snead's murder." *Peeler II*, supra, 271 Conn. 352 n.13.

[6] Capital felony trials are divided into two phases: the guilt phase and the penalty phase. "[I]n the guilt phase, the jury is charged only with the task of making the factual determination of whether the state has proved beyond a reasonable doubt that the defendant committed a capital felony." *State* v. *Rizzo*, 266 Conn. 171, 240, 833 A.2d 363 (2003). "In the penalty phase, by contrast, the jury is charged with both fact-finding and nonfact-finding tasks." Id. Its fact-finding task involves determining whether the state has established the facts of an aggravant beyond a reasonable doubt and whether the defendant has established the facts of a mitigant by a preponderance of the evidence. Id.; see also General Statutes § 53a-46a. Its nonfact-finding task involves determining, based on its reasoned and moral judgment, "whether: (1) the factually established mitigant is 'mitigating in nature'; and (2) the aggravant outweighs the mitigant." (Emphasis omitted.) *State* v. *Rizzo*, supra, 240. Following this weighing process, the jury must ultimately determine whether the defendant shall live or die, "which requires the jury to 'make a reasoned moral and individualized determination' that 'death is the appropriate punishment' in the case." Id., 239.

[7] For example, the petitioner made the following statements during the hearing:

"This is my constitutional right, I just want to exercise—this is what I have right to, I comprehend that.

***

"Listen, I have a right to defend myself and this is a very serious issue. I mean I am trying [to] show that my confinement is illegal. It's illegal, and they are doing nothing. They're doing nothing for. They're doing nothing for me.

***

"I would like to lay upon the record, I feel that I was (inaudible) I have the right to represent myself. And I am (inaudible) doing anything. This is incredible. This is incredible."

[8] Habeas counsel were concerned with the petitioner's insistence on proceeding with the habeas trial while his direct appeal of his death sentence was pending because the timing could cause him to waive certain claims and remedies with respect to his second penalty phase.

[9] The petitioner asks this court to recognize a constitutional right to self-representation at a habeas trial pursuant to article first, § 8, of the Connecticut constitution, which states: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ." We decline to address this claim because the petitioner failed to provide an independent analysis of it under the Connecticut constitution. See *State* v. *Skok*, 318 Conn. 699, 701 n.3, 122 A.3d 608 (2015).

The petitioner in his statement of the issues also appears to seek recognition of a constitutional right to self-representation in a habeas proceeding under the federal constitution. Nevertheless, the petitioner acknowledges in his brief that the sixth amendment right to counsel, and the concomitant right to self-representation, applies only to *criminal prosecutions*, not civil habeas proceedings. See *Martinez* v. *Court of Appeal of California*, 528 U.S. 152, 120 S. Ct. 684, 145 L. Ed. 2d 597 (2000) (no constitutional right to self-representation on direct appeal); *Pennsylvania* v. *Finley*, 481 U.S. 551, 555, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987) (no constitutional right to counsel in state habeas proceeding); *Ross* v. *Moffitt*, 417 U.S. 600, 610–11, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974) (no constitutional right to counsel in discretionary appeal because "[t]he defendant needs an attorney on appeal not as a shield to protect him against being 'haled into court' by the State and stripped of his presumption of innocence, but rather as a sword to upset the prior determination of guilt"). See also *Faretta* v. *California*, 422 U.S. 806, 814, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) ("the Sixth Amendment right to the assistance of counsel implicitly embodies a 'correlative right to dispense with a lawyer's help' " during a *criminal prosecution*). On the basis of the petitioner's analysis in his brief, we interpret the petitioner's argument as asking us to recognize the right to self-representation in a habeas proceeding as being equivalent to the constitutional right to self-representation in a criminal prosecution, not to recognize a right to self-representation in a habeas proceeding under the federal constitution.

[10] Although the petitioner focused in his brief on the statutory right to

counsel and the right to self-representation discussed in our rules of practice, the respondent focused on the residual common-law right to self-representation. Whether the right to self-representation during a habeas proceeding is found in our statutes, rules of practice, or common law does not affect our analysis in the present case.

[11] We emphasize, however, that the petitioner's claim is based on a *nonconstitutional* right to self-representation. As a result, the standard for finding a waiver in the present case would ordinarily be less rigorous than if it involved the constitutional right to self-representation. See *L & R Realty* v. *Connecticut National Bank*, 246 Conn. 1, 14, 715 A.2d 748 (1998) (appropriate to apply lower standard in determining enforceability of prelitigation contractual jury trial waivers than for waivers in criminal case); *Fuentes* v. *Shevin*, 407 U.S. 67, 94–95, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972) (standards for waivers of rights in criminal case would not necessarily apply to civil litigation); see also *State* v. *Francis*, 322 Conn. 247, 262, 140 A.3d 927 (2016) (safeguards employed to protect a defendant's constitutional right to counsel do not apply to defendant's statutory right to counsel). Nevertheless, because the petitioner's waiver of his right to self-representation was effective under the constitutional standard, we need not decide what the appropriate standard would be for finding waiver in the context of the nonconstitutional right to self-representation.

[12] Although our Supreme Court has held that a defendant cannot *implicitly* waive his right to self-representation after a court clearly and conclusively denies his request to represent himself, it has neither held nor suggested that a defendant cannot *explicitly* waive his right to self-representation after such a ruling. The general rule is that a defendant can waive his rights and privileges, even constitutional ones, expressly or implicitly. See generally, *State* v. *Bellamy*, 323 Conn. 400, 417–422, 147 A.3d 655 (2016) (collecting cases); see, e.g., id., 417 (claims of instructional error can be explicitly or implicitly waived); *State* v. *Woods*, 297 Conn. 569, 585–86, 4 A.3d 236 (2010) (waiver of right to jury trial may be express or inferred from election of a nonjury trial); *State* v. *Jarzbek*, 204 Conn. 683, 697–99, 529 A.2d 1245 (1987) (right to confront witnesses may be implicitly or expressly waived), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988); *State* v. *Harris*, 188 Conn. 574, 580–81, 452 A.2d 634 (1982) (knowing and voluntary waiver of right to remain silent can be found in both the defendant's words or conduct), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983). The reason we will not infer waiver in the context of the right to self-representation is because there is a risk that a defendant will acquiesce to the appointment of counsel after the court denies his request to represent himself because he believes that the option of self-representation is no longer available or that reasserting his right to self-representation would be futile, not because he intends to relinquish or abandon his right to self-representation. See *State* v. *Bellamy*, supra, 443 ("waiver involves the intentional relinquishment or abandonment of a known right or privilege" [internal quotation marks omitted]). When a defendant explicitly states that he no longer wishes to represent himself—for example, because he now realizes that it is in his best interest to proceed with counsel—there is no doubt that the defendant intends to relinquish or abandon a known right.

[13] Under the cause and prejudice standard, "the petitioner must demonstrate good cause for his failure to raise a claim at trial or on direct appeal and actual prejudice resulting from the impropriety claimed in the habeas petition. . . . [T]he cause and prejudice test is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, inadvertence or ignorance . . . . [T]he existence of cause for a procedural default must ordinarily turn on whether the [petitioner] can show that some objective factor external to the defense impeded counsel's efforts to comply with the [s]tate's procedural rule. . . . [For example] a showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or . . . some interference by officials . . . would constitute cause under this standard. . . . A court will not reach the merits of the habeas claim when the petitioner fails to make the required showing." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 567–68, 941 A.2d 248 (2008).

[14] We further observe that the record before us is devoid of any specific factual findings by the court concerning the viability of an appellate claim challenging the constitutionality of the trial schedule. In other words, the petitioner's assertion that this claim was not yet ripe at the time of his direct appeal lacks factual support in the record. "We have repeatedly recognized

. . . that the denial of a request for a continuance is appealable." *Jackson* v. *Commissioner of Correction*, 227 Conn. 124, 136, 629 A.2d 413 (1993). Yet, the petitioner never asked appellate counsel whether his decision not to challenge the trial schedule on appeal was a tactical decision or one based on the inadequacy of the appellate record. For this reason as well, we decline the petitioner's invitation to review this claim even though he failed to raise it below.

[15] Accord *Murphy* v. *Florida*, 421 U.S. 794, 800, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975) (no inherent prejudice where voir dire "indicates no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside"); *United States* v. *Campa*, 459 F.3d 1121, 1148 (11th Cir. 2006) ("the court's careful and thorough voir dire rebutted any presumption of jury prejudice"); *Coleman* v. *Kemp*, 778 F.2d 1487, 1541 n.25 (11th Cir. 1985) (assuming without deciding that presumptive prejudice can be rebutted by voir dire); *Tunnell* v. *Wiley*, 514 F.2d 971, 977 (3d Cir. 1975) ("whatever 'presumption of prejudice' may have existed was effectively 'rebutted' by the affidavit submitted by [the prosecutor], showing the interrogation of the jurors in regard to the allegedly prejudicial article but an absence of challenges on that basis"); see also *Patton* v. *Yount*, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984) (passage of time before second trial "clearly rebuts any presumption of partiality" that existed at time of initial trial).

[16] The petitioner incorrectly asserts that appellate counsel provided ineffective assistance because he was not aware of the inherent prejudice standard at the time of the petitioner's appeal. Although we agree that appellate counsel equivocated about the research he conducted, his equivocation was about the degree of research he performed into the inherent prejudice standard, not about whether he was aware of the inherent prejudice standard at the time of the petitioner's appeal. The court clearly credited the portions of appellate counsels' testimony in which he admitted to familiarizing himself with the inherent prejudice standard more than those in which he attempted to minimize the extent of his research and his familiarity with the law, and we cannot conclude that the court's credibility finding was clearly erroneous in that respect.

[17] Walkley also represented the petitioner in the federal narcotics case.

[18] The petitioner argues for the first time on appeal that the recordings were material and favorable to him because they corroborated Williams' testimony about when the petitioner was at 200 Earl Avenue and further illuminated the relationship between Williams and Lee, which was important because Lee wrote him a letter in which she stated that she lied at trial about the Clarke-Brown murders. See footnote 19 of this opinion. Because these arguments were never presented to the court, we decline to consider them for the first time on appeal. See *Mitchell* v. *Commissioner*, 68 Conn. App. 1, 7, 790 A.2d 463, cert. denied, 260 Conn. 903, 793 A.2d 1089 (2002).

[19] After Lee testified on behalf of the state in the guilt phase of the petitioner's trial, she wrote a letter to Williams, in which she stated: "Norman, you know that I lied on the Peelers, but I was scared when the police came to the house to get me so I told them that I had something to do with the murder." She was subsequently recalled by the petitioner and examined concerning this letter.

[20] Keene testified that for her narcotics conspiracy conviction her mandatory sentencing range was ten years to life imprisonment. Pursuant to her plea agreement and the cooperation agreement, Keene stated that her sentencing range would become zero to twenty years imprisonment and that she hoped to receive a time-served sentence.

[21] Ryan testified that for his narcotics conspiracy conviction his mandatory sentencing range was five to forty years imprisonment. Pursuant to his plea agreement and cooperation agreement, Ryan stated that he could be sentenced to less than five years imprisonment and that he hoped to be sentenced to probation.

[22] We further observe that the petitioner did not present any evidence that Keene and Ryan knew about the CI recording at the time of their trial testimony, that they believed that they could have been prosecuted for their statements on the CI recording, or that they could have been prosecuted for conspiring to kill Lee and Jennings. See General Statutes § 53a-48 (a) ("[a] person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy"). Therefore, it is unclear whether the CI recording would have influenced their trial testimony.

[23] A pen register is a device that records the telephone numbers of outgoing calls. A trap and trace is a device that records the telephone numbers of incoming calls.

_____